UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-----------------------------------------------------------------X

| | |
|---|---|
| UNITED STATES OF AMERICA EX REL. BEN RAYMOND AND GABE RAYMOND, | : |
| | : **Civil Action No. _____** |
| | : |
| Plaintiff, | : **COMPLAINT** |
| - against - | : |
| | : **FILED IN CAMERA** |
| ST. JUDE MEDICAL, INC., | : **AND UNDER SEAL** |
| | : |
| Defendant. | : **JURY TRIAL DEMANDED** |

-----------------------------------------------------------------X

**COMPLAINT FOR RELIEF
UNDER THE FALSE CLAIMS ACT**

**FILED IN CAMERA PURSUANT TO 31 U.S.C. § 3730(b)(2)**

1.     Relators BEN RAYMOND and GABE RAYMOND, through their attorneys, on their own behalf and on behalf of the UNITED STATES OF AMERICA ("United States" or "Government"), bring this action against ST. JUDE MEDICAL, INC. ("St. Jude" or "Defendant") and allege based upon personal knowledge, relevant documents, and information and belief, as follows:

## INTRODUCTION

2.     This is an action to recover treble damages and civil penalties on behalf of the United States of America arising from a fraudulent action and/or fraudulent course of conduct by St. Jude which naturally made, used, or presented, or caused to be made, used, or presented false and/or fraudulent records, statements and claims to the United States. This fraudulent conduct of defendant St. Jude Medical, Inc., was perpetrated by St. Jude and any of its affiliates, their agents, employees and, contractors, and/or co-conspirators, in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended (the "FCA" or "the Act").

3.     St Jude's fraudulent course of conduct has caused the United States by and through the U.S. Department of Health and Human Services ("HHS"), the Health Care Finance Administration ("HCFA"), and the Centers for Medicare and Medicaid Services ("CMS"), under the Medicare and Medicaid programs, to unnecessarily pay excessive cost reimbursements to hospitals throughout the United States for implantable cardioverter defibrillators ("ICDs"), cardiac pacemaker devices ("pacers"), and cardiac resynchronization therapy devices ("CRTDs"). ICDs, pacers and CRTDs are collectively referred to as "cardiac

rhythm management devices" or "CRMDs."

4.      Since 1999 St. Jude has earned billions of dollars from the sale of its CRMDs to hospitals. These hospitals are reimbursed by insurance programs for these CRMDs in the vast majority of instances.   Government insurance programs, including state Medicaid programs and, primarily, the Medicare program pay for most of the CRMDs which are sold and implanted in United States.   Industry estimates are that approximately 80% of all CRMDs are reimbursed by Medicare alone.  St. Jude knows most patients receiving CRMDs are older patients who are eligible for Medicare benefits.

5.      Many thousands of CRMDs are implanted as replacement CRMDs in which an explanted CRMD is removed from the patient. These removed CRMDs are often replaced due to, among other reasons:  (1) battery depletion, (2) product defect, or (3) an upgrade in technology to a purportedly superior St. Jude CRMD.   When St. Jude CRMDs are prematurely removed because of battery depletion or product defect, hospitals should receive "warranty credits" often equal to the full cost of the replaced device.  When CRMDs are removed in order to upgrade patients to technologically advanced CRMDs, hospitals should receive upgrade credits of up to 25% of the value of the replaced device.

6.      St. Jude touted these potential "warranty credits" or "upgrade credits" to its customer base, including physicians, hospital clinical staff, hospital purchasing agents and group purchasing organizations, to show that the products were reliable and less expensive than competitors' products.  Contradictory to these marketing ploys, St. Jude created an

environment which encouraged, promoted, and condoned the systematic prevention of credit issuance.

7.     According to the St. Jude written policy the replaced CRMD should be physically returned to St. Jude.  However, St. Jude sales representatives acted in their own financial self-interest and the financial interest of St. Jude by preventing the physical return of the CRMDs, thereby suppressing the processing and issuance of warranty credits. Explanted CRMDs were often concealed or destroyed in order to avoid payment of warranty or upgrade credits.

8.     The Relators have direct knowledge that since 1999 St. Jude prevented hospitals from obtaining warranty and upgrade credits for replacement CRMDs.[1]  In so doing, St. Jude caused hospitals, including Government-owned Veterans Administration Hospitals, across the country to be deprived of many millions of dollars in credits.  This conduct caused hospitals to submit Medicare and Medicaid claims that overstated the actual replacement costs for CRMDs.

9.     The amounts at issue stemming from this conduct are staggering.  By St. Jude's own analysis of its products, as many as 74,403 CRMDs failed, suffered battery depletion, or were upgraded while under warranty.  Given this figure, since 1999 the company should have paid aggregate warranties approaching approximately $407 million.  However, the

---

[1]     The CRMDs that are the subject of this complaint can be found in the attached **ATTACHMENT 1**.

company's warranty credits issued for these years totaled only about $22.78 million according

to the company's public filings.

10.     Examples of St. Jude's conduct in suppressing the issuance or payment of

warranty or upgrade credits on CRMDs are as follows:

- St. Jude's CRMD warranty and upgrade credit policies are integral parts of the sales representatives' marketing to doctors and hospital administration and staff. Yet St. Jude sales representatives suppress the actual issuance of such credits by concealing warranty and upgrade procedures from hospital administrators and staff. Each replaced CRMD which is removed within the warranty period or under upgrade specifications should be physically returned to St. Jude. This step is a necessary predicate to obtain the credits. By concealing this requirement from hospital staff, St. Jude enables the destruction of CRMDs which are eligible for credit processing because hospital staff routinely discard the explanted devices without any knowledge of warranty or upgrade credit implications. Such conduct prevents the issuance of a credit to the hospital. In turn, this creates needless cost reimbursements by the Government and the states;

- St. Jude's sales representatives also directly control whether CRMD warranty and upgrade credits are processed and issued. St. Jude's sales representatives and sales managers routinely acted to prevent the physical return of CRMDs. For instance, St. Jude sales representatives would instruct hospital staff to (1) discard the CRMDs, (2) give the CRMD to the patient as a souvenir or memento, or (3) give the CRMD to a St. Jude representative who would then destroy, discard, stockpile, or conceal the CRMD;

- St. Jude's sales representatives did not receive instruction, management or oversight promoting the proper processing of warranty or upgrade credits. In fact, St. Jude sales representatives' compensation was reduced any time a warranty or upgrade credit was paid on their accounts. Accordingly, St. Jude sales representatives were allowed to continue the suppression of credits to their personal financial benefit and the financial benefit of St. Jude;

- The managers of St. Jude's sales representatives were incentivized to avoid paying warranty and upgrade credits because the payment of the credits reduced sales revenue goals that controlled their compensation plan; and

4

- Among St. Jude personnel, the company's sales representatives admitted they regularly caused replaced CRMDs to be destroyed or concealed in order to prevent hospitals from receiving credits.

11.     St. Jude has been aware that warranty credits were not paid as required.  St. Jude possesses data which evidences each CRMD eligible for a warranty or upgrade credit. From this information, St. Jude knew its replaced CRMDs were often eligible for credits. St. Jude also knew that the warranty and upgrade credit payments it actually made were just a fraction of the credits available for replaced CRMDs.

12.     In sum, St. Jude has withheld hundreds of millions of dollars in CRMD credits from hospitals.  Without an awareness that CRMD credits were owed to them, hospitals then in turn submitted cost reimbursement information to government programs, particularly Medicare and to a lesser extent Medicaid, which were inflated as a result of St. Jude's suppression of these credits amounting to hundreds of millions of dollars.  In the case of Government owned hospitals, the Government was immediately harmed by St. Jude's credit concealment.

## JURISDICTION AND VENUE

13.     This action arises under the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

14.     The jurisdiction of this court exists pursuant to Sections 1331 of the United States Judicial Code, 28 U.S.C. § 1331, and the FCA, 31 U.S.C. § 3732.

15.     Venue in this court exists pursuant to Section 1391 of the Judicial Code, 28

5

U.S.C. § 1391 and the FCA, 31 U.S.C. § 3732.

## PARTIES

16.     Plaintiff, Relator, Ben Raymond, is a resident of Bellaire, Texas. He began

working at St. Jude in February 1999 as a sales representative. His responsibilities included,

but were not limited to, contacting cardiac specialists to sell St. Jude's CRMDs, working with

hospital staff concerning CRMDs, and attending and participating in the medical procedure

to implant and/or explant CRMDs into patients. He was the recipient of various sales

awards, sat on St. Jude's Presidential Advisory Council, and was a St. Jude "field trainer."

He voluntarily resigned from St. Jude in April 2008 despite St. Jude's lucrative offers to stay.

17.     Plaintiff, Relator, Gabe Raymond, is a resident of the Houston, Texas. He

began working at St. Jude in April 2003 as a sales representative. His responsibilities

included, but were not limited to, contacting cardiac specialists to sell St. Jude's CRMDs,

working with hospital staff concerning CRMDs, and attending and participating in the

medical procedure to implant and/or explant CRMDs into patients. He voluntarily resigned

from St. Jude in April 2008 despite St. Jude's lucrative offers to stay.

18.     In connection with their work in the CRMD field, Relators have worked

directly with or have direct knowledge about the following hospitals and their affiliates: The

Methodist Hospital, Houston, Texas; St. Joseph's Medical Center, Houston, Texas; Memorial

Herman Hospital, Houston, Texas; Veterans Administration Medical Center, Houston, Texas;

University of Texas Medical Branch, Galveston, Texas; Kingwood Hospital, Houston, Texas;

6

Clearlake Regional Medical Center, Clearlake/Webster, Texas; Bayshore Medical Center, Pasadena, Texas; St. Luke's Episcopal Hospital, Houston, Texas; Christus St. Elizabeth's Hospital, Beaumont, Texas; Beaumont Baptist Hospital, Beaumont, Texas; St. Mary's Hospital, Port Arthur, Texas; Northeast Memorial Medical Center, Humble, Texas; and Ben Taub Community Hospital, Houston, Texas.

19.     Plaintiff United States is a sovereign entity.  During the applicable time period, the United States, directly through its own hospitals as well as more typically through its health insurance programs, spent billions of dollars in connection with St. Jude CRMDs which were implanted throughout the United States.

20.     Defendant St. Jude Medical, Inc. ("St. Jude") is a Minnesota corporation, with its principal place of business at One Lillehei Plaza, St. Paul, Minnesota.  St. Jude's CRMD headquarters and its primary manufacturing facility are in Sylmar, California.  St. Jude's United States Sales Division headquarters (known as USSD) are located in Austin, Texas.

21.     The acts alleged in this Complaint were authorized, ordered and/or performed by St. Jude, its officers, directors, agents, employees, representatives, designees, or subsidiaries while engaged in the management, direction, control, or transaction of St. Jude business affairs.

## THE GOVERNMENT'S CRMD REIMBURSEMENT COSTS
## WERE INFLATED WHEN ST. JUDE DID NOT PAY CREDITS

22.     CRMDs are generally paid for by the hospital where the implanting procedure is performed.  Applicable insurance programs reimburse the hospital for the expense of the CRMDs.  The overall U.S. market for CRMDs was $7.3 billion in 2003 and has been growing.  St. Jude had greater than $2.1 billion in annual CRMD sales in 2007.  Of these sales, over 30% of the dollars are attributable to the implantation of replacement devices, and a significant portion of those replacements involved explanted CRMDs eligible for unpaid credits.

23.     The United States Government's Medicare and Medicaid programs pay for the vast majority of implanted CRMDs.  State agencies charged with state-level Medicaid responsibilities also reimburse hospitals across the nation for replacement of CRMDs. Because the medical conditions requiring therapy with CRMDs are primarily associated with patients over the age of 65, the cost of CRMDs is generally covered by Medicare.

24.     Medicare has used several billing and payment systems over the last several decades, including: (1) cost-based reimbursement; (2) the Inpatient Prospective Payment System ("IPPS") for certain inpatient hospital services; and (3) the Outpatient Prospective Payment System ("OPPS") for certain outpatient hospital services. During the pertinent times, doctors performed surgery to replace CRMDs both through inpatient and outpatient procedures, depending primarily on the complexity of the procedure and the patient cardiac disease state.

8

25.     For inpatient services, under the IPPS, each case is categorized into a diagnosis-related group (DRG), a system that classifies stays by patient diagnosis and procedures. Each DRG has a payment weight assigned to it, based on the average resources used to treat Medicare patients in that DRG. The base rates for IPPS for medical devices such as CRMDs, is calculated, in part, on the actual costs of the CRMDs implanted . As discussed herein, the Medicare DRG payments associated with CRMD replacements were inflated by the unlawful conduct of St. Jude.

26.     For outpatient services, prior to 2000, Medicare reimbursed hospitals on the basis of their actual costs. Since about August 2000, Medicare has reimbursed hospitals through OPPS. OPPS reimbursement rates are promulgated as Ambulatory Payment Classifications ("APCs"). In arriving at APCs, Medicare authorities took into account the actual costs of CRMD procedures. As with the DRG payments, Medicare costs associated with APCs were inflated by the unlawful conduct of St. Jude.

27.     Even after OPPS began in 2000, for some "pass-through" medical devices, CMS would pay an additional amount while it gathered data on the cost of CRMD procedures for these new devices. These data included inflated costs due to St. Jude's unlawful conduct. After CMS had gathered this data and determined an APC rate, the "passthrough" procedure would end.

28.     Although the calculation of IPPS, OPPS, DRG and APC reimbursements has varied over time, the cost of CRMDs has always been included in the formulae. The cost of

CRMDs to hospitals is the most significant factor used as a basis to establish Medicare reimbursement to provider hospitals for implantation and subsequent replacement of CRMDs. During some of the pertinent times, to assist HHS to evaluate and set DRG rates of reimbursement, hospitals have been required to submit or cause to be submitted to HCFA, and later CMS, certain standardized information including the hospital cost for implanted medical devices and credits and/or reimbursements against the cost for CRMDs. As discussed herein, this cost information from hospitals was inflated due to the unlawful conduct of St. Jude.

29.     Medicare and Medicaid require that hospitals not submit for reimbursement CRMD claims for which a warranty or upgrade credit should be available. Typically, hospitals have departments that have responsibility for obtaining warranty and upgrade credits. However, these departments are highly dependent upon operating room procedures to identify when a CRMD is under warranty or subject to an upgrade. This is because at the time the devices are implanted, the explanted/replaced device must be returned to St. Jude. Similarly, the instruction cards explaining how to obtain warranty credits are only available at the time that a new device is implanted. If the instruction cards are discarded, there is no record to guide the hospital through the warranty procedure for a particular product.

30.     The hospital personnel responsible for retaining the devices and instruction cards are operating room support staff. Typically, these support staff will depend on the St. Jude sales representative to tell them how the explanted device should be treated. It is also

typically the St. Jude sales representative who opens the implanted device package and handles the warranty instruction card.  The St. Jude sales representative therefore plays a critical role in making sure that proper steps are taken so that the hospital can obtain warranty or upgrade credits.  St. Jude sales representatives routinely discarded the warranty instruction cards and/or concealed such cards from the hospital staff. For instance, St. Jude representatives attached warranty instruction cards in patient charts or records upon implantation knowing that these papers were not reviewed when the device was explanted. As described previously, St. Jude representatives also routinely instructed hospital staff to discard or destroy CRMDs which were eligible for warranty or upgrade credits as well as directly destroy the replaced CRMDs themselves.

31.   As discussed more fully below, St. Jude's concealment of available warranty and upgrade credits caused hospitals to certify improper reimbursement requests to Medicare and/or Medicaid.  Hospitals mistakenly made improper reimbursement submissions to the United States without warranty or upgrade credits being reflected.  The result of this conduct was to inflate the hospitals' costs of CRMD replacement procedures and naturally cause the United States to overpay CRMD reimbursements by hundreds of millions of dollars.

11

## ST. JUDE'S SALES INCENTIVE STRUCTURE DISFAVORS WARRANTIES AND UPGRADES

32.     St. Jude manufactures and distributes CRMDs. It markets its CRMDs through agents, both direct sales representatives and purportedly "independent" manufacturers' representatives (referred to collectively both infra and supra as "sales representatives"). Sales representatives are intimately familiar with how hospital payments systems work and how hospitals interact with Government insurers like Medicare and Medicaid.    Sales representatives often know hospital payment employees personally.

33.     All sales representatives are controlled by St. Jude and their subject conduct pertaining to the suppression of warranty and upgrade credits is within the course and scope of their work for St. Jude. St. Jude supervised all sales representatives in the same way. The sales representatives work under identical St. Jude directives, and are perceived by hospitals and doctors as agents of the company. All sales representatives have St. Jude business cards, wear St. Jude surgical scrubs during CRMD implanting procedures, and give away St. Jude marketing items such as pens, post-it notes and the like.  St. Jude gives all its sales representatives a delineated geographic area to cover for sales.  All St. Jude sales representatives' commission compensation is tied directly to CRMD implants or "implantation", including replacements, and all St. Jude sales representatives face the same financial and company pressures to avoid the processing of warranty and upgrade credits.

34.     St. Jude's sales representatives are compensated based upon CRMD sales. While some sales representatives received a minimal up-front salary of less than a third of

their entire compensation plan, St. Jude also retained other sales representatives purely on a commission basis. All sales representatives' compensation was tied directly to net CRMD sales. All sales representatives had sales quotas and most sales representatives were compensated with larger percentage commissions as they made more new sales. Thus, besides providing an initial commission, each new sale contributed to a sales representatives' overall percentage compensation by impacting the sales representatives' "running average" and the related increase or decrease in commission percentage governing all their sales.

35.    On average, sales representatives receiving a partial salary earned between 10% and 12% for each implanted pacer. The other sales representatives received up to 20% for each pacer sale. Pacers have a sales price of about $5,000. Similarly, partial salary sales representatives received on average 3% to 7% for each ICD or CRTD sold. The other sales representatives received between 12% and 15% for each ICD or CRTD sold. ICDs and CRTDs each have a sales price of about $15,000 to $30,000. Sales representatives earned basically nothing if a CRMD failed within the warranty period, was returned to St. Jude, and a credit was issued by St. Jude.

36.    Surgeons, cardiovascular surgeons, cardiologists and electrophysiologists, decide what brand of CRMD to use. Thus, although CRMDs are sold to hospitals, St. Jude's sales representatives view these doctors as their primary customers. Importantly, the physicians are not responsible for the warranty or upgrade credit submission process and are not typically involved at all in warranty or upgrade credits. These physicians simply implant

the medical devices in their patients at hospital facilities.  Secondary customers include

hospital staff, hospital administration, and purchasing organizations.  Sales representatives,

including Relators, attend the procedures in which the doctors implant the CRMDs into

patients.  This work happens at all hours of the day and night, and is time consuming.

37.   Sales representatives' work associated with any implantation does not vary,

regardless of whether the product is under warranty or subject to upgrade.  However, the

compensation of the sales representative varies dramatically depending on whether the

product is under warranty or subject to an upgrade when explanted.

38.   In addition to draining significant work time, St. Jude sales representatives

viewed warranty and upgrade procedures as a penalty for two reasons.  The first reason

derives from the way St. Jude pays commissions.  Sales representatives are initially paid a

commission for any CRMD procedure.  Only months later, if a warranty or upgrade credit

is approved, would the sales representatives find that his or her pay has been reduced by the

amount of commission already paid.[2]  At times, this commission reduction can mean that the

sales representative must pay St. Jude money back for a procedure from many months ago.

The second reason is that St. Jude does not count procedures involving warranty and upgrade

credits as unit sales.  Therefore, St. Jude will not include those procedures in the calculation

---

[2]      Relators recently became aware that St. Jude began providing "warranty bonuses"
for its sales representatives in the event that the warrantied device was returned.  This "bonus"
only partially offsets warranty credit-based commission reductions.  Relators were never notified
that this incentive was being enacted, nor were the specific parameters for receiving a warranty
credit bonus ever defined to them via verbal or written communication.

that determines whether a sales representative's commission percentage should be increased (say from 10 to 12%) based on his or her high running average of unit sales.

39.     Like sales representatives, supervisors of the sales representatives and other managers are paid bonuses that depend on the revenue from and the number of new implantations of CRMDs that sales representatives make. Like the sales representatives, supervisors of sales representatives receive no bonus for CRMD replacements of warrantied or upgraded products. Many St. Jude managers of sales representatives were formerly sales representatives themselves. St. Jude sales management is knowledgeable of the fact that incentives exist to promote the suppression of warranty or upgrade credits.

40.     St. Jude provided no formal training to sales representatives, including Relators, regarding the procedures to follow when a product that is under warranty or subject to upgrade is replaced. The company has had no guidelines, policies or procedures for sales representatives relating to reporting of warranty or upgrade credits. Sales representatives are not told to alert hospitals to the availability of warranty or upgrade credits. Sales representatives are acutely aware, however, that if the hospitals apply for a warranty or upgrade, it will directly negatively affect their compensation. St. Jude sales representatives predictably act in their own financial self-interest and the financial interest of St. Jude by suppressing the processing and issuance of warranty and upgrade credits.

## THE WARRANTY PROCEDURES REQUIRE RETURN OF THE CRMD WHICH ST. JUDE PERSONNEL SYSTEMATICALLY PREVENT

41.     St. Jude's corporate policy is to bill the hospitals up front whether or not a

warranty credit or upgrade credit applies.   Later, the warranty or upgrade credit can
theoretically be obtained if particular procedures are followed.  Each CRMD has a warranty
instruction card in its package.   These instructions require certain specific conduct for
hospitals to be able to claim a credit.

42.   St. Jude's general "Warranty Procedures" provide, among other things, that the
following steps must be taken for a warranty credit to be claimed:

- The device itself should be returned within 90 days of replacement for
  pacemakers and 45 days for ICDs and CRTDs.

- If for some reason the device cannot be returned, then the electrocardiograph
  (ECG) strips from the procedure can be sent in for a technical evaluation to
  determine whether the device behaved inappropriately or the battery depleted.

- Upon receipt of the products, St. Jude's warranty department will automatically
  review whether a warranty applies if the device malfunctioned or the battery
  was depleted.  Battery depletion is an acceptable reason for warranty credits
  to be applied.

- The device must be replaced within the specified warranty period.   The
  warranty period for pacers is five years.  The warranty period for ICDs and
  CRTDs is three years for a 100% warranty.   Thereafter, the warranty is
  reduced.  After 3 years until the device is four years old, the warranty is 75%.
  After four years until the device is five years old, the warranty is 50%.
  (Certain of the most recently released St. Jude pacemakers have a reduced
  4-year warranty period for battery depletion.)

- The device must be replaced with a St. Jude product.

- The credit will be issued to the hospital.

43.   Thus, among other requirements, the procedures provide that the hospital
should send St. Jude the explanted CRMD (or evidence of failure from ECG strips) in order

to ensure that a warranty is available on any particular warrantied product. CRMDs sent back to St. Jude will be directed to the Return Goods Department. This department will log the returned good and do an analysis of how the device performed and the reasons for its replacement. If the department personnel finds that the device malfunctioned or that the battery was depleted during the warranty period, a warranty credit will generally apply.

44.     St. Jude's warranty policies are facially very generous, and appear to display the company's confidence in the performance of its CRMDs. Sales representatives use St. Jude's warranty policies as integral parts of their marketing pitches to physicians for the CRMD products. At the same time, however, St. Jude representatives prevent hospitals from retaining the devices, a necessary predicate to be able to submit a valid warranty claim. Most often this was done by St. Jude representatives instructing hospital operating room staff to discard the replaced CRMDs or to give the CRMDs back to the patients. At other times, St. Jude representatives retain the CRMDs themselves and then destroy or dispose of the CRMDs. St. Jude sale representatives also discard the CRMDs warranty instruction cards so that hospital personnel do not know what procedures to follow to obtain a warranty. The overall goal of these various practices is to prevent the hospitals from obtaining warranty credits from St. Jude.

45.     For example, Denise Brown, a former sales representative for St. Jude in Houston, Texas, has commented to Relators that she kept "a box" of explanted devices in her garage so that those devices would not be timely returned to St. Jude for warranty or upgrade

credit processing. Ms. Brown made these comments in 2005 at a regional meeting in which sales representatives complained that certain CRMDs were performing poorly and that the replacements were going to impair their compensation. There was no reason for Ms. Brown to have a box of devices in her garage except to prevent the hospitals from obtaining warranty and upgrade credits.

46.     In the second half of 2007, Denise Brown reported to certain St. Jude sales representatives and management that St. Luke's Episcopal Hospital in Houston was beginning to "suspect" that "they should be getting more warranty credit than they are currently receiving." Ms. Brown warned that "Luke's is now paying very close attention to all device battery replacements and upgrades."

47.     Other sales representatives also inappropriately held on to devices. As a sales representative in Amarillo, Texas, Chris Gilliam kept "a bucket" of devices in his possession. In 2004, Mr. Gilliam was promoted to a management position. He was replaced by Gordon Lieb. Mr. Lieb told Relator Ben Raymond at a sales meeting in 2004 that he had inherited the bucket of devices from Mr. Gilliam when Mr. Gilliam was promoted to manager. According to Mr. Lieb, Mr. Gilliam's told him that the bucket was, in effect, "his problem now." There was no reason for Mr. Gilliam to have a bucket of devices except to prevent the hospitals from obtaining warranty or upgrade credits.

48.     Another sales representative, Jesse Gallardo, also systematically discarded or caused to be discarded CRMDs. Mr. Gallardo worked at Northeast Memorial Medical

Center (formerly Houston Northeast); The Methodist Hospital; St Joseph's Hospital in

Houston, Texas;   Kingwood Regional Medical Center in Kingwood, Texas; Weimar

Hospital, Weimar, Texas; St Luke's Episcopal Hospital, Houston, Texas; Houston Medical

Center, Houston, Texas; Brazosport Regional Health Systems Hospital, Lake Jackson, Texas;

and Angleton Danbury Medical Center, Angleton, Texas. Through conversations with St.

Jude support staff, including with Breann Fobbs, Jessica Taylor and Brent Temple, Relators

learned that Mr. Gallardo instructed St. Jude support staff to either discard replaced CRMDs

or give the replaced CRMDs to Mr. Gallardo, rather than leave them with the hospital staff.

The reason for Mr. Gallardo to instruct St. Jude personnel to act in this way was to prevent

the return of the CRMDs to St. Jude and prevent the hospitals from obtaining warranty

credits.

49.     At a meeting with hospital staff members of St. Joseph's Medical Center in

Houston, Texas, the Director of the Cardiac Catheterization Lab, Sharon Farnham, and the

lab staff member responsible for the billing of CRMDs, Laura Fernandez, asked Relators

why St. Jude's pacers were not lasting very long and questioned if St. Jude should be

applying warranty credits to these failing devices. Jesse Gallardo was the sales representative

responsible for selling the pacers to St. Joseph's Medical Center.

50.     These are not isolated incidents, but rather are part of a pattern of behavior at

St. Jude. At a meeting in the Houston restaurant, Trevesio, a St. Jude regional sales manager,

Bobby Jackson, told Relator Gabe Raymond that St. Jude was not interested in paying

warranties.  In January 2008, Mr. Jackson also stated to  Relators that the company frowned on paying out any costs related to failed products.  Mr. Jackson made this statement as a criticism of Relators' past attempts to obtain reimbursements by St. Jude in connection with patients incurring out-of-pocket expenses for CRMD replacement procedures.  In connection with these CRMD replacements Relators also caused the replaced CRMDs to be returned to St. Jude.  Mr. Jackson conveyed to Relators that Relators' attempts to obtain this compensation for patients would negatively affect their ability to negotiate a lucrative new contract with St. Jude.  He said that by seeking expenses for patients on failed products showed that Relators showed that they were not team players.

51.     Through conversations with St. Jude employees throughout the United States, Relators have learned sales representatives in other regions also systematically prevented hospitals from obtaining warranty credits.  For instance, St. Jude President's Club Award Winner, Massimo Roselli, noted that a particularly successful St. Jude sales representative in the New Jersey/New York area was infamous for suppressing warranty credits on replaced CRMDs.

### PRODUCT FAIL RATES SHOW ST. JUDE MASSIVELY UNDERPAID WARRANTIES

52.     St. Jude has only paid about 10% of its total warranty obligations.  Between 1999 and 2007, according to its public filings, St. Jude issued $22.78 million in warranty credits.  During the same time, St. Jude's fail rates for CRMDs under warranty should have resulted in warranty expenses of nearly $407 million.

53.     The extent of St. Jude's CRMD fail rates can be extrapolated from certain St. Jude studies, known as Product Performance Reports.  These reports contain information by CRMD model, including, the number of registered implants for a particular CRMD, how many of the products failed, when the products failed in their life cycle, and whether the CRMD failed because of battery depletion.

54.     The 2008 Product Performance Reports show 215,971 registered implants of nine different pacer models occurred from 1999 to 2007.[3]  In connection with these implants, 67,281 pacers were explanted during their applicable five-year warranty period.  The vast majority of these explanted pacers were replaced due to battery depletion or failure and should have received a full warranty credit.  Each pacer had an estimated average cost of between $4,000 and $5,000.  Thus, the dollar value of credits that St. Jude should have paid solely for these nine pacer products approaches $303 million.

55.     The 2008 Product Performance Reports show 41,985 registered implants of eight different ICD models occurred from 2000 to 2007.[4]  In connection with these implants, 1,381 ICDs were explanted within the full coverage three-year warranty period and were thus eligible for a 100% warranty credit; 2,304 ICDs were explanted within the three-to-four year

---

[3]     The pacer models are Identity DR, Integrity Adx DR, Identity Adx DR, Integrity M DR, Affinity DR, Meta DR1, Meta DR/Tempo DR pop 1, Meta DR/Tempo DR pop 2, and Tempo VR.

[4]     The ICD models are Photon Micro VR, Atlas VR, Epic DR, Atlas DR, Photon Micro DR, Contour, Epic+ DR, Profile, and Profile (On Advisory).

warranty period and were thus eligible for a 75% warranty credit; and 3,044 ICDs were explanted within the four-to-five year warranty period and were thus eligible for a 50% warranty. Virtually all of these ICDs were replaced because of battery depletion, malfunction or upgrade. If the ICDs had been properly returned to St. Jude, the vast majority of these explanted ICDs should have resulted in a warranty credit being issued. Each ICD has an estimated average cost of between $15,000 and $18,000. The number of total warranties that St. Jude should have paid solely for these ICDs is thus likely to approach $96 million.

56.     The 2008 Product Performance Reports show 3,091 registered implants of one CRTD model (Epic HF) from 2003 to 2007. In connection with these implants, 185 CRTDs were explanted and replaced during the three year warranty period. In connection with these implants, 208 CRTDs were replaced during the three-to-four year warranty period. These CRTDs were normally replaced due to battery depletion or malfunction. These CRTDs had an estimated average cost of $20,000 each. The total value of warranty credits that St. Jude should have paid solely for this CRTD model is thus likely to approach $7.8 million.

57.     Given that Medicare covers around 80% of the patients receiving these devices, with Medicaid covering a portion of the remaining 20%, when warranty credits for CRMDs were suppressed as exemplified above, St. Jude's conduct directly led to the Government paying hundreds of millions of dollars in excessive device reimbursements.

58.     These estimates of warranty liability are likely to be conservative for several reasons. First, products released since 2004 do not have the full five years of data showing

explants. Second, the Product Performance Reports may also underestimate failure rates to the extent that St. Jude personnel under-report failures in their respective data submissions or if patients died without autopsy. Last, these numbers are estimates of only 19 products and do not include the many other products which also experienced failure rates while under warranty.

59.     To pay warranties on all of these underperforming devices would have caused large liabilities for the company and highlighted the poor battery performance of St. Jude's products. The company was eager to underplay the prevalence of battery failures because those failures carried significant clinical risks for patients.

## ST. JUDE'S SMALL DEVICES WERE CASH COWS, IF NO WARRANTIES WERE PAID

60.     St. Jude's failure to pay warranties resulted in perverse incentives for the company. If St. Jude did not pay warranties, then the shorter life span of a CRMD translated directly into more revenue for the company from more frequent sales. In a meeting in Houston in 2002, St. Jude's president of sales, Michael Rousseau, stated to Relator Ben Raymond that the company did not need pacers that lasted a long time. He stated that the company would kill itself if it had pacemakers that lasted too long.

61.     Several new pacers called the Identity and Integrity Micro models, which were released between 2000 and 2003, typified the advantage the company could achieve if it could both sell short-lived CRMDs and yet not actually pay the warranty credit when such short-lived CRMDs were replaced within their warranty period. Four of these Identity and

Integrity Micro models have been responsible for approximately $750 million to $1 billion in sales. Yet, these four products should have triggered the payment by St. Jude of about $290 million in warranty credits. Because St. Jude routinely avoided paying and reporting warranty credits due on these products, St. Jude's sales of these products were inflated. This result was achieved at the ultimate expense of Government payors.

62.     The new Integrity Micro and Identity pacers that were released beginning in 2000 were significantly smaller than older St. Jude pacers. This decreased size was attributable to smaller battery design. Doctors appreciated the smaller size of these new devices. The devices were significantly more comfortable for the patients and easier to implant.

63.     Eventually, these products became very popular with doctors because St. Jude marketed them as being nearly as long-lived as their larger counterparts. Doctors were generally unwilling to sacrifice longevity for size, because if a pacemaker's battery failed, it would mean that the doctor would have to perform another invasive procedure to install another CRMD in the patient, thus compromising patient safety.  St. Jude sales representatives were given data, including St. Jude's published longevity estimates available in the "Physician User Manual" of each product, to show doctors and hospitals that laboratory bench testing indicated good longevity estimates for the products. St. Jude offered full five-year warranties for these pacer products.

64.     The Integrity Micro Model Numbers 5336 and 5360 were released into the

United States market at the end of 2000. At the time of the release, St. Jude marketed the Integrity Micro as having excellent longevity (battery life) of over 6 years while also owning a significant size advantage to its competitor products. As it turned out, according to St. Jude's Product Performance Reports, the batteries for the Integrity Micro devices had a fail rate of about 25% to 33% before the end of five years.

65.     Like the Integrity Micro, the Identity pacemakers Model Numbers 5370 and 5380 had far too optimistic assumptions about longevity. Although St. Jude's marketing data highlight the exceptional longevity estimates for these models, in reality they had a battery fail rate within the five year warranty period of 78% and 18% of all implanted units, respectively. As with the Integrity Micro, St. Jude should have issued warranty credits for as many as 78% of all Identity 5370 implanted units and 18% of all Identity 5380 implanted units.

66.     By 2003 and over the succeeding years, the batteries of many of the Integrity Micros and Identity products began to fail well before their five-year warranty had been reached. St. Jude sales representatives throughout the United States recognized these product failures and routinely highlighted to upper-level management that longevity problems existed. However, replacements of these products were generating substantial sales because St. Jude was not paying warranties on these products.

67.     The premature battery failures of these and other products was compounded by a St. Jude policy to pay sales representatives bonuses if they could sell devices that were

about to reach their expiration or "implant by" date. Devices near their expiration date would be much more likely to fail prematurely than devices that had just been manufactured. Not only was this policy likely to cause more potential warranty liabilities for the company, it was dangerous for patients. If a battery did fail prematurely and the patient died there might not be a record of the event because CRMDs are not normally explanted after death. In fact, sales representatives used to comment that, in the CRMD industry, "we bury our mistakes."

68.     Eventually, due in part to clinical concerns of physicians and negative field feedback, St. Jude was forced to recognize that its Integrity Micro and Identity pacers had compromised longevity. In 2007, St. Jude changed the battery depletion warranty period of the latest small battery iteration, the model 5820 Zephyr from five (5) to four (4) years.

69.     As with the Integrity and Identity pacers, an ICD, the Profile V-186, had short real-world battery longevity. Of 5,979 total implants, per St. Jude's Product Performance Report, over 20% were replaced within the first 1 to 3 years of the warranty period and were eligible to receive full warranty credit. Another 20% or more of these ICDs failed in years 3 and 4. Those ICDs should have received a prorated warranty credit of 75% of the ICD price applied. Accordingly, on this device alone, St. Jude likely suppressed over $30 million in warranty credits owed hospitals.

### ST. JUDE WAS AWARE OF THE WARRANTY AND UPGRADE UNDERPAYMENTS AND THE EFFECT ON MEDICARE

70.     St. Jude avoided honoring its warranties and knowingly shifted the warranty credit costs primarily to Medicare. St. Jude was aware that hospitals would pass along the

CRMD costs to Medicare if the hospital did not receive warranty credits. According to internal documents the company understood that "Medicare should pay the full amount of the [replacement procedure] irrespective of warranty payments."

71.      In various ways, St. Jude was aware of that it was not paying warranty credits when it should. For one, sales representatives told company managers when products under warranty were repeatedly failing. Sales representatives also spoke with their supervisors (many of whom had formerly been sales representatives themselves) about their practice of preventing the hospitals from retaining the CRMD to submit for a warranty or upgrade. When faced with evidence that sales representatives were interfering with the hospitals' ability to submit warranty or upgrade credits, St. Jude management did not act.

72.      Moreover, St. Jude possessed documentary evidence that it was not paying for thousands of failed devices that were still under warranty. When a CRMD replacement occurs, St. Jude sales representatives or their support staff will fill out a Patient Device Tracking ("PDT") form, which is a form generated from a software package used by the company. On this PDT form, the St. Jude employee will note particular information about the new device. In addition, the employee will note whether the implant was a replacement. If a device was being implanted as a replacement, the employee will input why the CRMD was replaced. If the battery was depleted, the employee will check a box that specifies that the replaced device's battery was either partially depleted and considered to be unsafe or completely depleted. If the replacement device was being implanted for any other reason,

there was a text box that allowed that reason to be specified. For replacements, the employee

will also note the specific date when the original implant occurred. This information in the

PDT form is sent by St. Jude representatives to the patient device tracking department at St.

Jude.

73.     Altogether, the information in the PDT form makes it clear whether or not the

CRMD was under warranty when it was replaced and whether the warranty should have

applied. These records alone show St. Jude knew the actual device failures on

warranty-eligible products significantly exceeded St. Jude's warranty credit payments.

Despite having this information in its possession, St. Jude continued to issue only meager

warranty credits which were dwarfed by its actual warranty-eligible product failures.

74.     St. Jude did not completely ignore the information in the PDT forms; it kept

track of the forms so that it had the data to include in the Product Performance Reports.

Nevertheless, St. Jude selectively disregarded this information and did not insure that

applicable warranties were reconciled with warranty product failure rates.

75.     St. Jude's upper level management, marketing and engineering personnel were

aware of St. Jude's failure to pay warranty credits. These people had constant access to

product performance reporting, patient device registration information, and marketing data

that showed significant failure rates (especially early battery depletion) during the warranty

period. Yet, these St. Jude personnel allowed St. Jude to habitually suppress credits. If the

proper credits had been issued the personal compensation of these individuals would have

28

been negatively impacted due to the structure of St. Jude bonuses.

76.     Similarly, through various means, including sales representative reports and third party academic studies, all technical support personnel in St. Jude's Bradycardia and Tachycardia Technical Support Services were informed of inaccurate and potentially life-threatening longevity estimates for certain St. Jude products. Despite this fact, for many years, St. Jude failed to notify the sales force of longevity problems with its products, especially the Integrity Micro and Identity pacers. Relators have direct knowledge of at least one patient who nearly died because of a pacemaker battery failed prematurely.

77.     Eventually, through its marketing choices, St. Jude demonstrated that it was aware of the warranty (and safety) problem it had with its products. In September 2006, St. Jude launched a new marketing campaign known as the "Move the Mix" campaign. This marketing campaign was designed to get doctors to start using St. Jude's larger, more long-lived pacers instead of the smaller models like the Integrity Micro and Identities. Sales representatives viewed this marketing strategy to be an admission that the smaller CRMDs previously marketed were unreliable, especially with respect to their longevity.  This marketing strategy was presented to the sales force during a Fall 2006 Regional Sales Meeting by Roger Graham, Senior Director of Marketing, who reported directly to the President of Sales, Michael Rousseau.  This marketing strategy was a recognition on St. Jude's part that its CRMDs performed poorly and were failing prematurely. Interestingly, all documentation of the "Move the Mix" campaign was subsequently removed from the St.

Jude intranet.

78.    St. Jude manager, Bobby Jackson, admitted to Relators that the Move the Mix strategy was instituted because St. Jude was trying to avoid paying warranty credits. Relators understood the best mechanism by which St. Jude could avoid paying warranty credits was by avoiding the implantation of CRMDs which had proven to fail within warranty periods often. Relators perceived that some in St. Jude may have also come to realize that its practices in suppressing the processing of warranty credits needed to stop.

## UPGRADES WERE TREATED SIMILARLY TO WARRANTIES

79.    Upgrades occurred when CRMDs were replaced for different, technologically more advanced CRMDs, even while the implanted CRMD was still functioning. St. Jude invested heavily in a marketing campaign to shift upgrade implantations to its brand of CRMDs as part of a progressive therapy for a patient. St. Jude offered upgrade credits of up to 25 percent of the price of the new product as a way to convince doctors and hospitals to switch device brands or upgrade to other St. Jude products. The marketing campaign was successful in part because of the representations that there would be upgrade credits.

80.    Unlike warranty credits, physical return of the explanted device was not required to obtain upgrade credits. Rather, it was the sole responsibility of the sales representatives to submit the paper work to obtain the upgrade credits. However, as with the warranty credits, sales representatives and management were incentivized to avoid having the company pay upgrade credits. St. Jude sales personnel would suffer commission

reduction and reduced compensation if they submitted upgrade credit paperwork.

81.    After winning over an account with the sales tactic and appropriately submitting a few upgrade credits, St. Jude sales representatives thereafter frequently did not submit the upgrade credit paperwork.

82.    As with warranty credits, the practice of acting to subvert the payment of upgrade credits was prevalent throughout the St. Jude sales organization.

## COUNT I
### Violations of 31 U.S.C. § 3729(a)(1)-(2)
### False or Fraudulent Claims Arising from St. Jude Conduct

83.    Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth in this paragraph.

84.    St. Jude's conduct violated the False Claims Act. St. Jude knowingly presented false claims or information to Government (Veterans Administration) hospitals and caused false or fraudulent claims or information for CRMDs to be presented to the Government for payment in violation of Section 3729(a)(1) of the Act.

85.    The conduct constituted a "fraudulent course of conduct" within the meaning of applicable authority interpreting the False Claims Act. DRG claims and other Government mechanisms for reimbursement or payment for CRMDs were rendered "false or fraudulent claims" within the meaning of Section 3729(a)(1) of the False Claims Act.  These claims were wrongfully inflated.

86.    St. Jude's violations were knowing in the sense that their officers, agents,

31

employees and representatives acted with actual knowledge, deliberate ignorance and/or reckless disregard of the truth.

87.    St. Jude's false statements and fraudulent course of conduct were material to the Government's decision to pay the claims because they had the natural tendency to influence or were capable of influencing the willingness of Government health care programs to reimburse the costs of CRMDs at inflated prices which were not reflective of the hundreds of millions of dollars in credits St. Jude had improperly avoided.

88.    St. Jude "caused" hospitals to present claims for CRMDs at false prices, and "caused" the Government to pay those claims, within the meaning of the term "caused" as used in Section 3729(a)(1) of the False Claims Act, in the sense that the presentation of such claims by such providers, and the payment of those claims by the Government, was a foreseeable and intended result of St. Jude's fraudulent course of conduct.  St. Jude's fraudulent course of conduct was a substantial factor and proximate cause of such claims being presented and paid at the inflated prices.

89.    Each CRMD that was presented to a Government healthcare program for reimbursement at the inflated price was a false or fraudulent claim.  Relator cannot at this time identify individually each of such claims as they were presented by thousands of separate providers, across the United States, and over several years.  Relator has no control over or dealings with such providers and has no access to records in their possession.

90.    Nevertheless, as an example, various hospitals including The Methodist

Hospital in Houston, Texas have reported that the following claims for St. Jude CRMDs at issue in this case were inappropriately submitted to healthcare programs for reimbursement in the years set forth in the table below:

| Replacement Model | SERIAL NO. | DOI | Initial Model | SERIAL NO. | DOI |
|---|---|---|---|---|---|
| 5370 | 955659 | 1/24/2006 | 5336 | 616405 | 8/9/2002 |
| 5380 | 1460611 | 2/20/2006 | 5370 | 585625 | 3/28/2002 |
| 5376 | 970532 | 2/21/2006 | 5330L | 52523 | 6/1/2001 |
| 5370 | 1071559 | 4/20/2006 | 5370 | 670772 | 9/25/2002 |
| 5370 | 1071601 | 4/20/2006 | 5336 | 280113 | 8/4/2001 |
| 5346 | 976325 | 4/24/2006 | 5346 | 578989 | 1/23/2002 |
| 5380 | 1510412 | 4/24/2006 | 5336 | 685012 | 12/30/2002 |
| 5816 | 1509016 | 5/15/2006 | 5336 | 534504 | 11/1/2001 |
| 5360 | 1095471 | 6/5/2006 | 5370 | 670595 | 10/21/2002 |
| V-337 | 243998 | 8/18/2006 | V-338 | 12165 | 9/4/2003 |
| 5380 | 1567220 | 9/11/2006 | 5336 | 684914 | 3/3/2003 |
| V-268 | 325760 | 9/11/2006 | V-240 | 60587 | 10/21/2002 |
| 5810 | 1500480 | 9/26/2006 | 5370 | 682103 | 11/8/2002 |
| 5610 | 1607660 | 9/28/2006 | 5336 | 628773 | 5/30/2002 |
| V-193 | 229318 | 10/5/2006 | V-232 | 44519 | 9/18/2002 |
| V-243 | 337491 | 10/6/2006 | V-240 | 71593 | 11/25/2002 |
| V-196 | 229398 | 11/14/2006 | V-197 | 15480 | 2/4/2003 |
| 5380 | 1640685 | 12/11/2006 | 5370 | 711606 | 3/31/2003 |
| 5380 | 1614353 | 12/12/2006 | 5336 | 621894 | 5/14/2002 |
| 5810 | 1602912 | 12/19/2006 | 5370 | 670279 | 10/17/2002 |
| 5380 | 1415614 | 1/3/2006 | 5336 | 59481 | 4/12/2002 |
| V-337 | 245697 | 8/9/2006 | V-232 | 45208 | 12/3/2001 |
| V-243 | 232056 | 11/2/2005 | V-240 | 71400 | 10/16/2002 |
| * DOI = Date of Implant | | | | | |

91.    The above examples are situations in which devices were replaced within applicable warranty periods yet warranty credits were not issued. Because 80% of patients who receive CRMDs ordinarily are Medicare recipients, most of these warranty credit suppression examples caused Medicare to pay unnecessary device reimbursements.

92.    By reason of St. Jude's acts, the United States has been damaged in an amount

equal to the warranty and upgrade credits that were suppressed. The United States has also been damaged in an amount equal to the difference between the cost-based reimbursements, such as DRGs, which they paid for CRMDs, and the reimbursements the Government and states would have paid had St. Jude not wrongfully engaged in its fraudulent course of conduct to suppress warranty and upgrade credits being paid to hospitals. Specifically, the CRMD prices which comprised a portion of the cost-based reimbursement calculations were inflated because the sales prices were not offset by the warranty or upgrade credit which were properly owed by St. Jude but never paid. The United States also has been harmed by the amount of warranty and upgrade credits owed by St. Jude to Government-owned hospitals.

93.     Medicare and Medicaid require that hospitals not submit for reimbursement CRMD claims for which a warranty or upgrade credit should be available. The Medicare Intermediary Manual § 3150 states that "[n]o payment can be made . . . for certain items and services" including those where there is "[n]o legal obligation to pay for or provide."

94.     Medicare Intermediary Manual § 3152 states that "[p]rogram payment may not be made for items or services which neither the beneficiary nor any other person or organization has a legal obligation to pay for or provide." Section 3152 also includes the following language: "If the device is replaced free of charge by the warrantor, no program payment may be made, since there was no charge involved."

The Medicare Provider Reimbursement Manual § 2103, provides:

2103. PRUDENT BUYER . . .

34

C. Examples of Application of Prudent Buyer Principle.--

. . .

4. Provider B purchases cardiac pacemakers or their components for use in replacing malfunctioning or obsolete equipment, without asking the supplier/manufacturer for full or partial credits or payments available under the terms of the warranty covering the replaced equipment. The credits or payments that could have been obtained must be reflected as a reduction of the cost of the equipment supplied.

95.     When a hospital files its paperwork for Medicare and/or Medicaid reimbursement, the forms include standard language in which the provider certifies to the United States substantially as follows: "I hereby certify that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report . . . and that to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations." 42 C.F.R. § 413.24(f)(4)(iv).

96.     As a result of St. Jude's fraudulent conduct and deliberate concealment of warranty provisions, medical providers were caused to submit Medicare and/or Medicaid reimbursement forms to the Government, certifying that the information provided complied with the applicable law.  These certifications were erroneous because of St. Jude's false and fraudulent conduct.

97.     These false certifications were the known ordinary and natural result of St. Jude's conduct.  St. Jude knew Government insurance programs, particularly Medicare, ultimately reimbursed for the vast majority of its devices implanted by physicians and hospitals.

98.     Because the acts of St. Jude placed hospitals into a situation of noncompliance with the Medicare and/or Medicaid rules, and of false certification to the United States St. Jude is liable under the False Claims Act for its false and fraudulent conduct.

99.     By marketing warranty and upgrade credits and then by hiding replaced CRMDs, disposing replaced devices, and by instructing hospital staff to dispose of or return back to patients replaced devices, all in order to avoid paying warranties or upgrades, St. Jude representatives knowingly defrauded hospitals.  Through this conduct, St. Jude knowingly and/or recklessly caused the hospitals to submit false claims to the Government for Medicare and Medicaid reimbursement approval.

100.    St. Jude's misconduct caused hospitals to make and use false records to get false claims paid in violation of Section 3729(a)(2) of the FCA (31 U.S.C. § 3729(a)(2)).

101.    As a direct and proximate result of St. Jude's conduct in violation of the FCA, Relators and the United States Government are entitled to damages as allowed pursuant to the False Claims Act.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment as follows:

(i)       that Defendant cease and desist from violating 31 U.S.C. §3729 *et seq.*;

(ii)      that this Court enter judgment against Defendant in an amount equal to three times

the amount of damages the United States has sustained because of Defendant's actions, plus a civil

penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S. C. §3729;

(iii)     that Relators be awarded the maximum amount allowed pursuant to §3730(d) of the

False Claims Act;

(iv)     that Relators be awarded all costs and expenses incurred, together with an award of

reasonable attorneys' fees, costs and expenses; and

(v)      that Relator be granted such other relief in law or equity as the Court may consider

necessary, appropriate, just or proper.

## JURY DEMAND

Relators hereby demand a trial by jury on all issues so triable.

RELATORS  BEN  RAYMOND  AND  GABE
RAYMOND

By their attorneys,

Andrew C. Griesinger (BBO 211285)
**GRIESINGER, TIGHE & MAFFEI, LLP**
176 Federal Street
Boston, MA  02110-2214
Tel:  (617) 542-9900
Fax:  (617) 542-0900
acg@gtmllp.com

37

**KIRBY McINERNEY, LLP**
Randall K. Berger (rberger@kmllp.com)
James Carroll (jcarroll@kmllp.com)
(pro hac vice motion pending)
David Kovel (dkovel@kmllp.com)
(pro hac vice motion pending)
825 Third Avenue, 16th Floor
New York, New York 10022
Tel:   (212) 371- 6600
Fax:  (212) 751- 2540

**ANDERSON LLC**
C. Jarrett Anderson (jarrett@anderson-llc.com)
208 West 14th Street, Suite 203
Austin, TX 78701
Tel: (512) 469-9191
Fax: (512) 532-0585

Dated: August 8, 2008

ATTACHMENT 1

# Attachment 1

**Cardiac Resynchronization Therapy "CRTD's"**
Atlas®II HF (V-366)
Atlas®II HF (V-365)
Atlas®+ HF (V-340)
Atlas®+ HF (V-343)
Epic® II HF (V-355)
Epic® HF (V-338)
Epic® HF (V-337)
Frontier® (5508)
Frontier® II (5586)
Promote® HE (3107-36)
Promote® RF HE (3207-36)

**Implantable Cardioverter Defibrillators "ICD's"**
Atlas® II DR (V-265)
Atlas® II DR (V-268)
Atlas® + DR (V-243)
Atlas® DR (V-240)
Atlas® DR (V-242)
Atlas® II VR (V-168)
Atlas® + VR (V-193)
Atlas® VR (V-199)
Contour® MD (V-175, V-175AC, V-175B, V-175C, V-175D)
Current® DR HE (2107-36)
Current® RF DR HE (2207-36)
Current® VR HE (1207-36)
Epic® II DR (V-255)
Epic® II DR (V-258)
Epic® + DR (V-236)
Epic® + DR (V-239)
Epic® DR (V-235)
Epic® DR (V-233)
Epic® II VR (V-158)
Epic® + VR (V-196)
Epic® VR (V-197)
Photon® μ DR (V-232)
Photon® μ VR (V-194)

**Pulse Generators "Pacers"**
AddVent® (2060)
Affinity® DC (5230)
Affinity® DR (5330, 5331)
Affinity® SR (5130, 5131)
Affinity® VDR (5430)
Entity® DC (5226)
Entity® DR (5326)
Identity® ADx DR (5380)
Identity® ADx XL DR (5386)
Identity® ADx XL DC (5286)
Identity® (5370)
Identity® XL (5376)
Identity® SR (5172)
Identity® ADx SR (5180)
Integrity® ADx DR (5360)

Integrity® ADx DR (5366)
Integrity® AFx DR (5342, 5346)
Integrity® μ DR (5336)
Integrity® SR (5142)
Integrity® ADx SR (5160)
Integrity® μ SR (5136)
Meta™ DDDR (1256D)
Meta™ DDDR (1256)
Microny® (2425T, 2525T, 2535K)
Paragon™ (2010, 2011, 2012)
Paragon™ II (2016)
Paragon™ III (2304, 2314, 2315)
Phoenix® II (2005, 2008, 2009)
Phoenix® III (2204, 2205)
Regency® SC+ (2400L, 2402L)
Solus® (2002, 2003)
Solus® II (2006, 2007)
Synchrony® II (2022, 2023)
Synchrony® III (2028, 2029)
Tempo® D (2902)
Tempo® DR (2102)
Tempo® V (1102)
Tempo® VR (1902)
Trilogy® DC+ (2318)
Trilogy® DR+ (2360, 2364)
Trilogy® SR (2250)
Trilogy® SR+ (2260, 2264)
Verity® ADx XL DR (5356)
Verity® ADx XL DR M/S (5357M/S)
Verity® ADx XL DC (5256)
Verity® ADx XL SR (5156)
Verity® ADx XL SR M/S (5157M/S)
Verity® ADx XL SC (5056)
Victory® DR (5810)
Victory® XL DR (5816)
Victory® SR (5610)
Zephyr™ DR (5820)
Zephyr™ XL DR (5826)
Zephyr™ SR (5620)
Zephyr™ XL SR (5626)


**Defibrillation Leads**
Riata® ST (7002)
Riata® ST (7000, 7001)
Riata® ST (7010, 7011)
Riata® ST (7040, 7041)
Riata® ST Optim™ (7070, 7071)
Riata® ST Optim™ (7020, 7021)
Riata® ST Optim™ (7022)
Riata® i (1590, 1591)
Riata® (1582)
Riata® (1570, 1571)
Riata® (1580, 1581)
SPL® (SP01, SP02, SP03, SP04)
TVL® RV (RV01, RV02, RV03, RV06, RV07)
TVL® SVC (SV01, SV02, SV03)
TVL® -ADX (1559)

**Pacing Leads**
ACE (1015M, 1025M)
ACE (1016T, 1026T)
Fast-Pass® (1018T, 1028T)
Fast-Pass® (1007)
IsoFlex® P (1644T, 1648T)
IsoFlex® S (1642T, 1646T)
OptiSense® (1699T, 1699TC)
Passive Plus® (1135K, 1143K, 1145K,1235K,1243K, 1245K)
Passive Plus® (1136T, 1142T, 1146T, 1222T, 1226T,1236T, 1242T, 1246T)
Passive Plus® DX (1343K, 1345K)
Passive Plus® DX (1336T, 1342T, 1346T)
Permathane® ACE (1036T, 1038T)
Permathane® ACE (1035M)
Tendril® (1788T, 1788TC)
Tendril® (1782T, 1782TC)
Tendril® (1148, 1188T)
Tendril® (1188K)
Tendril® DX (1388K)
Tendril® DX (1388T, 1388TC)
Tendril® SDX (1688T, 1688TC)
Tendril® SDX (1488T, 1488TC)
Tendril® ST Optim™ (1888T, 1888TC)
Tendril® ST Optim™ (1882T, 1882TC)
QuickSite® (1056T)
QuickSite® (1056K)
QuickSite® XL (1058T)